UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ALICIA PAGAN,

                Plaintiff,

-vs-

CITY OF ROCHESTER, ROCHESTER POLICE DEPARTMENT, ROCHESTER POLICE CHIEF MICHAEL CIMINELLI, ROCHESTER CITY COUNCIL, MAYOR LOVELY WARREN, ROCHESTER POLICE OFFICER JOHN DOE 1, ROCHESTER POLICE OFFICER JOHN DOE 2, ROCHESTER POLICE OFFICER JOHN DOE 3, and ROCHESTER POLICE OFFICER JOHN DOE 4,

                Defendants.

DECISION AND ORDER

17-CV-6073-CJS

## APPEARANCES

| | |
|---|---|
| For Plaintiff: | Kevin R. Clark, Esq.<br>Wesley & Clark LLP<br>45 Exchange Boulevard<br>Suite 900<br>Rochester, NY 14614<br>(585) 546-1734 |
| For Defendants: | Patrick Beath, Esq.<br>City of Rochester<br>30 Church Street Suite 400A<br>Rochester, NY 14614<br>(585) 428-6812 |

## INTRODUCTION

**Siragusa, J.** This is an action brought by plaintiff Alicia Pagan ("Pagan") against individual City of Rochester police officers, Michael Ciminelli, the Chief of Police of the Rochester Police Department, Lovely Warren, the Mayor of the City of Rochester, and the Rochester City Council. In a 94-page amended complaint filed on March 8, 2017, ECF No. 4, Pagan alleges

that the officers used excessive force against her on November 2, 2015, when she was attempting to locate her son at Rochester General Hospital. Defendants have moved to dismiss some causes of action. Pagan conceded in her memorandum of law that she does not allege sufficient claims against the Rochester Police Department and the Rochester City Council.

After hearing oral argument, and reviewing the parties' submissions, Defendant's application for partial dismissal is granted as follows: all claims against the Rochester Police Department and the Rochester City Council are dismissed; all claims against the City of Rochester, with the exception of any respondeat superior liability for the state law assault and battery causes of action, are dismissed; all claims against the Chief of Police and Mayor are dismissed; and the claims for intentional and negligent infliction of emotional harm and negligence against the individual officers are dismissed.

## BACKGROUND

Pagan's amended complaint,[1] ECF No. 4, alleges the following operative facts, which the Court presumes are true for the purposes of adjudicating the motion.

> 14. On November 2, 2015 at approximately 9:00 pm, Plaintiff became the victim of a violent interaction with Defendant Officers, when without warning they grabbed Plaintiff by each arm, squeezing tightly, dragged her from a walkway to a nearby wall, slammed her body into the wall, twisted her arms behind her body and applied handcuffs so tightly that the Plaintiff's wrists, hands and fingers went numb.
>
> 15. At approximately 8:20 pm on this same date, Plaintiff was notified that her son, Jonathan Delgado, had been shot and was rushed to Rochester General Hospital for emergency treatment. At this time his condition was unknown to Plaintiff.
>
> 16. By approximately 8:30 pm on this same date, Plaintiff and her daughter had arrived at Rochester General Hospital's Emergency Department. Once inside, they checked-in with the front desk employee of the department, inquiring

---

[1] Contrary to the local administrative guidelines, Pagan's amended complaint was not filed as a text-searchable .pdf document. Western District of New York Administrative Procedures Guide for Electronic Filing 2(a)(v). Future filings must comply with the requirement in the guide, or will be stricken from the docket.

about Mr. Delgado's wellbeing. They were told they would have to wait because he was in surgery and they were promptly escorted into a small waiting room. In this room, the Plaintiff waited with approximately ten family members for about thirty minutes.

17. After about thirty minutes in the first waiting room, Plaintiff was called by a nurse to a nearby, second waiting room. Here, Plaintiff waited with her daughter, Christina Labron, as the nurse and a security guard would check in on them, each providing comfort and praying with Plaintiff.

18. At this point, Plaintiff was nervous and crying so the nurse began checking her heart rate and blood pressure periodically, concerned that Plaintiff was not well.

19. After one to two hours of waiting in the Rochester General waiting rooms, RPO police officers arrived to continue their investigation into the shooting of Plaintiff[']s son. Defendant Officers are white males and were at this time, in uniform. As they walked in, they began asking Plaintiff questions about her son and the shooting incident, to which Plaintiff provided general pedigree information and then kindly asked to be left alone until she heard news of her son's condition. In fact, Plaintiff was not talking to anyone at this point as she was so nervous about her son's wellbeing, she sat silent in this waiting room with her daughter, at first, and then as it filled with hospital staff and RPO police officers, including Defendant Officers.

20. After this initial interaction, Defendant Officers were in and out of the waiting room where Plaintiff sat, crying, praying and being comforted by her daughter and the kind security guard.

21. At some point later in the evening, Defendant Officers returned to the room, as did additional nursing staff and a doctor. The doctor began telling Plaintiff of the measures the medical staff had taken during her son, Jonathan's surgery. Plaintiff stopped the doctor and said that she didn't want to hear about the procedures; rather, she just needed to know if he was okay. The doctor paused, and the room was silent for a few seconds as Plaintiff waited for the news. At this point, the doctor delivered the news that Plaintiff[']s son, Jonathan, did not survive the shooting.

22. At this point Plaintiff fell to the floor, crying, she said, "Please tell me that is a lie. Please tell me that my son is okay." Plaintiff then got up and as she moved toward the door, she asked the doctor, "Please let me see my son." Plaintiff recalls someone telling her that she couldn't see her son, she continued asking to see him.

23. As she approached the doorway, Defendant Officers were standing there. Plaintiff attempted to walk past them in the doorway, as she was asking to see her son. Defendant Officers backed up out of the doorway and Plaintiff walked through, into the hall outside of the waiting room. As she entered the

hall, only seconds after hearing of her son's death, Plaintiff turned right into the hall looking for a doorway in an attempt to find her son.

24. In the hall, Plaintiff is asking the nurses that are in the hall with her, "Please , can you tell me where my son is, I want to see my son." In response , the nurse told her that she could not see him. Defendant Officers chimed in and also told Plaintiff that she could not see her son. As this is happening, Plaintiff is in the hallway outside of the waiting room, crying, walking and looking around. Plaintiff was emotional, but calm. She was not raising her voice or behaving in any way that could be construed as violent, confrontational or intimidating.

25. Then, less than a minute after hearing of her son's death, one of Defendant Officers grabs Plaintift tightly, by her right arm. He applies pressure and Plaintiff said, "Please let me go, I don't want to be touched." Then another Defendant Officers grabs Plaintiff by her left arm and applied pressure, which resulted in immediate pain to Plaintiff. At this point, Plaintiff was begging Defendant Officers to let her go, saying "Could you please let me go, I don't want no one to touch me. Please let me go." Plaintiff was emotional and crying but was not aggressive.

26. Plaintiff was trying to get the officers to let go of her arms, indicating that they were hurting her. Crying, Plaintiff again stated, "Please let me go." Defendant Officers then twisted Plaintiff s left arm back and pushed her into the wall in the hallway and then handcuffed her with both hands behind her back. Plaintiff was crying as she pleaded with the officers to remove the handcuffs or at least loosen them, as they were too tight.

27. Defendant Officers ignored Plaintiff[']s pleas to loosen the handcuffs and forced her to sit in a chair in the hallway. Plaintiff continued to ask the officers to loosen the handcuffs as her wrists began to hurt and her wrists, hands and fingers went numb. Plaintiff even told the officers that she suffers from tendonitis and urged them to remove or loosen the handcuffs.

28. Plaintiff continued cry and plead with Defendant Officers to loosen or remove the handcuffs and Jet her go back into the waiting room, this lasted for over twenty (20) minutes. During this time Plaintiffs daughter, Christina Labron, asked the officers, "Why would you handcuff my mom? My mom just found out that my brother died." The officers didn't respond.

29. After approximately twenty minutes of sitting in the hall, handcuffed, Defendant Officers removed the handcuffs and allowed Plaintiff to return to the waiting room. Defendant Officers would not allow the Plaintiff to leave despite her repeatedly saying things like "I want to go home. I need to go home. I need to be in my house." The Defendant Officers held Plaintiff in this waiting room for at least another 30 minutes.

30. At this point, a female RPO Investigator (first name Kate) arrived and

began to ask Plaintiff questions about her son and the shooting incident. Plaintiff responded saying, "I will answer any questions that you want if you take me home." The investigator immediately took Plaintiff home and as they were driving expressed outrage at the fact that Plaintiff was handcuffed after finding out about her son's death. Appropriately, after a brief period at Plaintiffs house, the investigator decided to suspend the interview until the next day in response to Plaintiffs crying, mourning and generally emotional state.

31. At no time during the incident did Plaintiff pose a threat to the safety of Defendant Officers or the public. Ms. Pagan was not engaging in any criminal activity, she was not arrested, nor was she charged with a crime in connection with the events of November 2, 2015.

32. The conduct of Defendant Officers, in detaining Plaintiff and using force against her, was without probable cause, was unnecessary, excessive, and was done maliciously, falsely and in bad faith.

33. As a result of the events alleged herein, Plaintiff finds herself traumatized and unable to grieve in the way she would like, as every time she tries to process the events of that day and the death of her son she is forced to think about the actions of the Defendant Officers and the physical injuries that resulted.

34. As a result of the events alleged herein, and due directly to the actions taken by the individual defendants, Plaintiff suffered and continues to suffer physical pain, emotional trauma, discomfort, humiliation, fear, anxiety and embarrassment, among other things.

Amend. Compl. ¶¶ 14–34.

Pagan's amended complaint contains the following causes of action: (1) excessive force under the Fourth and Fourteenth Amendments against the individual officers; (2) municipal liability under *Monell*[2] against the City of Rochester; (3) assault and battery under New York common law; (4) intentional infliction of emotional distress under New York common law; (5) negligent infliction of emotional distress under New York common law; (6) negligence under New York common law; (7) respondeat superior liability of the City [sic] of New York for

---

[2] *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

state law violations under the common law of New York; and (8) negligent supervision, retention, and training claim under New York common law.

Defendants move to dismiss Pagan's: *Monell* claim; all claims against the mayor, police chief, city council and the police department; the claims for negligent and intentional infliction of emotional distress; the negligence claim; and the negligent hiring, retention and training claims.

### STANDARD OF LAW

To survive a Rule 12(b)(6) motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*Twombly* holding applies to all complaints, not just those sounding in antitrust).[3] Although all allegations contained in the complaint are assumed true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft,* 556 U.S. at 678.

When applying this standard, a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers,* 192 F.3d 52, 56 (1999), *cert. denied,* 531 U.S. 1052, 121 S. Ct. 657, 148 L. Ed. 2d 560 (2000). On the other hand, "[c]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss." *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir. 1995) (*citing In re American Express Co. Shareholder Litig.,* 39 F.3d 395, 400-01 n. 3 (2d Cir.1994)). "[W]here

---

[3] Pagan's memorandum of law incorrectly states the prior standard. Pl.'s Mem. of Law 5, May 5, 2017, ECF No. 11.

the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation omitted). "The application of this 'plausibility' standard to particular cases is 'context-specific,' and requires assessing the allegations of the complaint as a whole." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Inv. Management Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (citation and internal quotation marks omitted).

## ANALYSIS

### *Monell Claim (Second Cause of Action)*

The general legal principles concerning *Monell* liability are well settled:

> Under the standards of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality. Absent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee.

*Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citations omitted).

Pagan argues that the city policymakers knew to a moral certainty that their police officers would be required to interact with grief stricken civilians, with civilians who have just been victims of a crime, and "with civilians that are emotional and upset on almost a daily basis." Pl.'s Mem. of Law 7. She argues specifically that,

> The need to train officers in the constitutional limitations on their interactions with said civilians, and more specifically the use of force, seizure and/or detention of these civilians in instances here no crime was committed is so obvious that failure to do so demonstrates a deliberate indiferece to the constitutional rights of these people.

*Id*. She further alleges that the policymakers know that officers in the department "have a history of mishandling these situations by escalating the interaction with unnecessary force," and that the police "so often violate constitutional rights that the need for further training is

7

plainly obvious to the policymakers, who nevertheless, are deliberately indifferent to the need to train/retrain their officers." *Id*. at 8.

In her amended complaint, Plaintiff pleads the following non-conclusory factual basis for this cause of action:

> Upon information and belief, prior to November 2, 2015, the Municipal Defendants were aware of numerous complaints of police misconduct involving the use of unnecessary and excessive force by RPD police officers against civilians. Despite their knowledge of such incidents prior misconduct, the Municipal Defendants failed to take remedial action....
>
> The Municipal Defendants do not require appropriate in-service training or retraining of officers who were known to have engaged in police misconduct.

Amend. Compl. ¶¶ 41[4] & 46. In support, attached to the amended complaint are papers from eleven civil complaints against the city or the police, or both, for excessive force. Amend. Compl. Exs. 1 – 11. Pagan argues that the defendants' response to each complaint is that the force used was necessary and proper and did not rise to the level of a constitutional violation. *Id*. ¶ 50. Pagan concludes that the numerous lawsuits for excessive force "demonstrate that there is a pattern of similar constitutional violations by untrained employees of the RPD." Further, that "Municipal Defendants were on notice of this defect in the officers' training as they were routinely served with complaints of unconstitutional misconduct." *Id*. ¶ 52.

Defendants contend that none of the cases demonstrate a factual situation similar to the one that was involved here: a distraught mother wandering the halls of a hospital looking for her injured son. They further argue:

> Plaintiff fails to plausibly allege that City policymakers knew to a moral certainty that police officers would encounter this situation. Police do not patrol in hospitals. The role of police officers is to enforce laws, not act as internal security guards. The facts here are out of the ordinary, are not a typical police enforcement scenario.

---

[4] Plaintiff's Amended Complaint's paragraph numbering skips from Paragraph 41 to Paragraph 44.

Def.s' Reply Mem. of Law 4. Defendants also argue that Pagan has failed "to identify a particular flaw in a City training program that allegedly caused her injury." *Id*.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In *Connick*, Justice Thomas further wrote for the majority:

> To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton,* 489 U.S., at 388, 109 S. Ct. 1197. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.,* at 389, 109 S. Ct. 1197.
>
> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty.,* 520 U.S., at 410, 117 S. Ct. 1382. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.,* at 407, 117 S. Ct. 1382. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton,* 489 U.S., at 395, 109 S. Ct. 1197 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities …." *Id.,* at 392, 109 S. Ct. 1197; see also *Pembaur, supra,* at 483, 106 S. Ct. 1292 (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials …").

*Connick,* 563 U.S. at 61–2.

As the Supreme Court observed in *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), "it is…difficult in one sense even to accept the submission that someone pursues a 'policy' of 'inadequate training,' unless evidence be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate." *Id.* at 804.

9

Pagan's allegations of inadequate training fail to allege any plausible factual basis for concluding that the Chief of Police or Mayor deliberately chose to ignore training officers on use of force in a hospital setting. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Board of the County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 409 (1997)). The pattern of lawsuits in the papers attached to the amended complaint have to do with law enforcement outside of a hospital setting and with individuals suspected of committing crimes.

For example, in *Warr v. Liberatore*, 13-CV-0508-EAW (W.D.N.Y. Sep. 13, 2013), Amend. Compl. Ex. 1, the complaint alleges that police used excessive force when arresting Warr, and his wife, also a plaintiff in the action, who sued for loss of consortium. Warr was arrested on the street in Rochester while sitting in his motorized wheelchair waiting for a bus. The matter is scheduled for alternative dispute resolution in November 2017. In *Turner v. City of Rochester*, No. 11-CV-6200-DGL-MWP (W.D.N.Y. Apr. 15, 2011), Amend. Compl. Ex. 2, the plaintiff alleges a Rochester Police officer refused to take information for a police report of her assault by a neighborhood youth with a rock and, instead, used excessive force to arrest her after she complained to 911. The plaintiff and defendants stipulated to dismiss the case. These are but two examples of the cases Plaintiff has presented in support of her argument that the mayor and chief were aware of the need for training to manage her in the hospital. In contrast to these and the other cases attached to her amended complaint, Pagan was not an arestee, but was a non-compliant hospital visitor who failed to obey medical staff when they told her she could not see her son[5] and that she needed to return to the waiting room. The Court

---

[5] The papers do not explain why the medical staff told Pagan she could not see her son, whom she then knew was dead.

determines that Pagan's allegations fail to plausibly plead a *Monell* claim of inadequate training.

*Supervisory Liability Claim*

Pagan labeled her seventh cause of action: "Respondeat Superior Liability of the City of New York [sic] for State Law Violations, Common Law Claim." Amend. Compl. at 18. However, in the body of the complaint, she asserts the following:

> The conduct of Defendant Officers alleged herein occurred while they were on duty and in uniform, in and during the course and scope of their duties and functions as a Rochester police officers, and while they were acting as agents, officers, servants and employees of Defendant Rochester. As a result, The Municipal Defendants are liable to Plaintiff pursuant to the state common law doctrine of respondeat superior.

Compl. ¶ 75.

Defendants have interpreted this claim as a § 1983 cause of action against Mayor Warren, Chief Ciminelli, the Rochester City Council, and the Rochester Police Department. Def.s' Mem. of Law 8. As previously discussed, Pagan conceded that she has no claims against the City Council or the Police Department. With regard to the Mayor and Police Chief, Defendants argue that as both were sued in their official capacities, the claims are redundant with those brought against the City of Rochester and should be dismissed. The Court agrees. *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State."). Thus, the official capacity claims against the Mayor and Chief of Police are dismissed.

*Establishing Liability Under 42 U.S.C. § 1983*

Turning to the personal capacity claims against the Mayor and Chief of Police, Pagan has not met the requirement to show personal involvement. A plaintiff may not rely on the doctrine of *respondeat superior* to establish liability in a § 1983 action. *Monell v. New York*

*City Department of Social Services,* 436 U.S. 658, 691-95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir. 1995) ("The bare fact that [Defendants Goord and McNamara] occupie[d] a high position in the New York prison hierarchy is insufficient to sustain [Plaintiff's] claim."). A prerequisite for liability under § 1983 is personal involvement by the defendants in the alleged constitutional deprivation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir. 1997); *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir. 1986). As the Second Circuit held *Sealey v. Giltner,* 116 F.3d 47 (2d Cir. 1997):

> A supervisory official is liable for constitutional violations if he or she (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation.

*Sealey,* 116 F.3d at 51 (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir. 1986)).

> "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. Id. (quoting *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986)).

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Plaintiff has failed to set forth allegations of personal involvement by either the Chief of Police or the Mayor, and her failure to do so mandates that her personal capacity claims against both be dismissed.

*Intentional Infliction of Emotional Distress*

The tort of intentional infliction of emotional distress, "has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993).

Defendants raise a public policy bar for claims of intentional infliction of emotional distress against governmental entities, which Plaintiff does not adequately address. *Afifi v. City of New York*, 104 A.D.3d 712, 713 (N.Y. App. Div. 2d Dep't 2013) ("Public policy bars claims alleging intentional infliction of emotional distress against governmental entities.") (citations omitted); *Calicchio v. Sachem Cent. Sch. Dist.*, 185 F. Supp. 3d 303, 314–15 (E.D.N.Y. 2016) ("While the allegations as they currently stand, … in this Court's opinion, constitute intolerable conduct sufficient to state a claim for intentional infliction of emotional harm against the Individual District Defendants. The claim of intentional infliction of emotional harm as against the District is dismissed given such a claim is barred by public policy."). The Court also agrees with Defendants' argument that this claim is duplicative of the assault and battery claims. Therefore, the intentional infliction of emotional distress claims are dismissed.

*Negligent Infliction of Emotional Distress and Negligence*

Pagan has alleged that Defendants' actions were intentional:

56. Defendant Officers' acts constituted an assault upon Plaintiff in that they intentionally attempted to injure Plaintiff or commit a battery upon her, and further their acts embarrassed, offended and physically injured to Plaintiff.

57. Defendant Officers' acts constituted a battery upon Plaintiff in that the above-described bodily contact was intentional, unauthorized and offensive.

58. The actions of Defendant Officers were intentional, reckless, unwarranted, and without any just cause or provocation, and Defendant Officers knew, or should have known, that their actions were without the consent of Plaintiff.

Amend. Compl. ¶¶ 56–58. However, in the cause of action alleging both negligence and negligent infliction of emotional distress, she argues that the officers' actions were "careless and negligent as to the emotional health of Plaintiff," and that their use of force against Pagan "constitutes negligence...." Amend. Compl. ¶¶ 67 & 71. Pagan's negligence claims are belied by her factual allegations, which do not make negligence claims plausible. *Mazzaferro v. Albany Motel Enterprises, Inc.*, 127 A.D.2d 374, 376 (N.Y. App. Div. 3d Dep't May 14, 1987) ("New York has adopted the prevailing modern view that, once intentional offensive contact has been established, the actor is liable for assault and not negligence, even when the physical injuries may have been inflicted inadvertently.") Consequently, Plaintiff's claims for negligent infliction of emotional distress and negligence are dismissed.

*Negligent Hiring, Retention, and Training Claims*

The Second Circuit in *Velez v. City of New York*, 730 F.3d 128, 136-137 (2d Cir. 2013), set out the requirements for claims of negligent hiring, retention, and training under New York law:

> To maintain a claim against a municipal employer for the "negligent hiring, training, and retention" of a tortfeasor under New York law, a plaintiff must show that the employee acted "outside the scope of her employment." *Gurevich v. City of New York*, No. 06 Civ. 1646 (GEL), 2008 U.S. Dist. LEXIS 1800, 2008 WL 113775, at *6 (S.D.N.Y. Jan. 10, 2008) (internal quotation marks omitted) (collecting cases). If the employee acted within the scope of her employment, the employer and the employee's supervisors may be held liable for the employee's negligence only under a theory of respondeat superior. *See Karoon v. N.Y.C. Transit Auth.*, 241 A.D.2d 323, 659 N.Y.S.2d 27, 29 (1st Dep't 1997).

*Velez*, 730 F.3d at 136–37. Here, Pagan alleges that:

> At all times relevant herein, the individual defendants were acting ... in the course and scope of their duties and functions as officers, agents, servants, and employees of Defendant Rochester, were acting for, and on behalf of, and with the power and authority vested in them by the Rochester and the RPO, and were otherwise performing and engaging in conduct incidental to the perforn1ance of their lawful functions in the course of their duties.

Amend. Compl. ¶ 10. As such, the claims for negligent hiring, retention and training do not lie and are dismissed.

## CONCLUSION

Accordingly, for the reasons stated above, Defendants' partial motion to dismiss is granted to the extent that only the following claims may go forward: the 1983 cause of action for excessive force against the individual officers; and the state law assault and battery claims against the individual officers, including any respondeat superior liability on the part of the City of Rochester.

IT IS SO ORDERED.

DATED: September 13, 2017
Rochester, New York

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge